This is the 1st District, 2nd Division of the Appellate Court. The following are the Justices for this case. Cynthia Cobbs, Terrence Lavin, and Justice Jim Smith. With that in mind, the following procedures will be followed. First, the Appellant present their case. We will not interrupt. After you're completed, we'll ask questions. Then the Appellee will have their chance to present their case. And then we will respond. And then the Appellant can close with their argument. This is Case 1-17-0310, The People of the State of Illinois v. Shante Thomas. If you're both ready, you may proceed. May it please the Court. Good morning, Your Honors. I represent Shante Thomas on behalf of the public defender. This is a murder case, Your Honor. My client was tried. She and her jury trials. And there are several issues that I briefed. I'm going to limit the number of issues that I mentioned this morning in the interest of time. And Your Honors, let me start out with the pretrial suppression motion. In a nutshell, the suppression motion should have been granted because the state used unmerandized, unrecorded statements concerning Ms. Thomas. She talked about herself. She talked about Mr. Minkins on April 25th of 2011. Now, despite what the police told her, despite the chatter and the record, my client was verily a suspect in this There was a second coerced interrogation that followed that one very shortly. And a statement arose out of that on the next day, April 26th of 2011. This was actually a continuation of the first interview. The second set of statements made day two, the next calendar day, were taped but coerced. They were involuntary, Your Honors. And a continuation of the first interview. Now, what was said on the second day, much of that was made after my client invoked her right to counsel. Her right to counsel was denied. There was a lawyer who called the police station. And counsel called the station and was told by the police, Ms. Thomas is just a witness. She's not Mirandized. She's not being charged with anything. She's just a witness. Counsel called back four or five hours later, only to be told that Ms. Thomas had been charged with murder. Now, at the time he initially called, most likely she'd been charged with obstruction of justice. When she came back the second day, she's asked to come back. She was charged with obstruction. She gave a statement that was actually recorded 427 after being worn down for 28 hours. Miranda was given later on, incident to that formal statement is given later, later, later in the process. It's important to talk about how my client got to the police station. So she's standing on sidewalk with Mr. Minkins on April the 25th, 2011. That's at approximately 2350 West Chewy. The police drive up in the vehicles, in the uniforms, and they step out. They step onto the sidewalk and they say that they want to detain Mr. Minkins. They turn to her and offer her a ride to the station. Now, to an average person, this is an offer that can't be refused. To an average person of color, to an average black person, she's thinking, oh, this is an offer I can't refuse. I should get in the car. Well, in effect, it was an arrest. Why is that? Because an arrest occurs when a reasonable individual does not believe that they're free to leave. People V. We. So they put her in a car. She's in her own car. So if she was not a suspect, it's interesting why they have a car there for her. But they did. So they drove her in one car. Mr. Minkins in a separate car. She's driven. They're driven 30 miles away to a police station in Markham. And so that certainly tends to make her look like a suspect from day one. And on this initial day of the interviews, what she said about herself ended up being used the second day. Now, the first day, remember, there's no recording. There's no Miranda. So what she says day one is used against her the second day. She's asked to come back to the station on the next day and was charged with obstruction of justice day two. Then she's interrogated for the 28 hours. It was continuous with the first interview. The police were abusive and they were coercive. How's that? Well, they told her, you've got to cooperate. You've got to answer our questions. We're not going to stop questioning you and pressuring you until we hear the answers that we want to hear. They use the B word. They said, you can be construed to be a heartless B. I won't actually say the word. And that's in the state's brief. She said she was hungry. She didn't feel well. She felt ill. She was cold. They removed her blanket. They told her, stop shaking, stop crying, answer our questions. And this went on and on and on. Now, while this is going on, a lawyer has called. She doesn't know that. They don't tell her counsel's call. She has no opportunity to speak to counsel. And indeed, our office now has a police station unit to try to avoid these types of situations. It did not exist in 2011. And the attorney who called from legal aid testified that, and he testified in court, that again, he's told Ms. Thomas is just a witness. She's not being Mirandized. She's not being charged. And by that time, likely she was already charged with obstruction. He calls hours later. She's charged with murder. The facts satisfy the test for involuntariness and coercion with respect to Miranda and this statement. Secondly, it's a violation of Missouri v. Siebert because in Siebert, court rules, Supreme Court rules, where there is an initial unwarned non-Mirandized statement and a subsequent statement, the defendant can't be confronted with the first unwarned un-Mirandized statement to get a confession by means of coercive tactics. And we certainly had coercive tactics here. And that first statement can't be used in concert with those coercive tactics. And there was, there were hours of coercion. So the first interview with lack of Miranda, its proximity to the second interview was calculating. It was not incidental. And in effect, a continuous interview because they believe my client was a suspect from day one. They knew who she was as they were investigating Mr. Mankins. They saw her. They knew that she was around him. So you don't start with an un-Mirandized statement and then later try to tack Miranda onto the end. That's not constitutional. So for that reason, we're asking that the case be reversed. I want to distinguish a case cited by the state, Matthews, People v. Matthews. Mr. Matthews was in custodial interrogation for seven hours and the court thought that that was fine. My client was in an interrogation for 28 hours. That's a little bit longer. Secondly, the trial court aired when it denied my client a victory on the pretrial motion to admit proof of other crimes of DeAndre Mankins. This is issue two of the brief and issue two in the reply brief as well. Simply stated, the use of evidence of other crimes is not exclusively limited to use by the state. The statutes don't preclude the admission of the evidence by the defense and the evidence excluded was absolutely relevant. Contrary to what the state tells you, it was relevant. Yes, it pertained to Mr. Mankins, but it was relevant to my client. By statutes, I'm speaking of section 5.4.115-7.4, as well as the Domestic Violence Act, section 60.4.103. Why was this relevant? Well, we have here a murder, defendant and co-defendant convicted of the murder of a woman, Rosemary Newman, who was expecting a baby. Very terrible situation. Co-defendant Mankins has a prior background of violent crime, violent crime against his family. Violent crime and a, I believe this was a head injury to a child in his care in his household. That was relevant given the case that we have here. Now, Mr. Mankins has four prior felonies. An offer of proof was made by trial counsel, defense counsel. My client does not have four prior felonies. She just returned from an enrichment program, might've been outward bound, but some type of an enrichment program, she returns. And then Mr. Mankins decides he wants to woo my client to be with him. And there's all kinds of chatter in Ms. Newman and did not want the baby. It's not nice. The state knows what he did. The state knows about these prior convictions and the evidence was relevant. He's in a relationship, a dating relationship, a personal relationship, a domestic relationship with the victim in this case and relevant because my client had the right to mount a defense and as a part of that defense to prove that someone else committed the murders with this, with this evidence, had it been admitted that might've changed the outcome of the case. The jury might've heard that and believe, you know, we believe Mr. Mankins was the sole killer of Ms. Newman. The excluded evidence could have changed the outcome. Uh, the record again is clear. Mr. Mankins did not want this that the state does not want the proof of other crimes admitted because they have a tendency to like for proof of other crimes to be admitted. So it's interesting that they don't in this case. Finally, your honors, um, regarding sentencing, if the conviction stands, we would respectfully ask that Ms. Thomas receive a new sentencing hearing. Uh, the reason for that is this. She was 19 years old at the time this occurred pursuant to house. We know under house the designation of the age of 18 in Miller terms, uh, for adulthood is somewhat arbitrary. That's what the house case says. You have two new cases. They came down May 25th of 2020 Ruiz and Johnson. And Mr. Ruiz was 18. Mr. Ruiz committed violent homicides. And what, what those cases say, and, and these are appeals from denied post conviction relief. So I'll let you know that distinction, but what the cases say is on the issue of sentencing, we're remanding so that the defense council can develop for the petitioner, put into the record, the new brain science about the undeveloped 19 year old brain, let them build a record, let them put an expert on, let them create this record for purposes of sentencing. So, and that that's an extension of Miller. That would be in concert with buffer with house. We are asking that at the very least, Ms. Thomas be given a new sentencing hearing Ruiz and Johnson had discretionary life sentences. So, so for these, for these reasons, we're asking for outward reversal or at the very minimum remand for a new sentencing hearing. Thank you. Well, I have just a brief question. You're challenging the relevancy of the evidence or I am of the other defendant. I would think that the other defendants evidence would prejudice totally. It's not, I don't see it's in your client's best interest that the other evidence come in. It is in that her background was clean and his was not. So I think that doesn't prejudice her prejudices him. Her background was clear that there was evidence that she was threatening the I'm sorry, sir. I said, how clean or clear is that? Well, that's not a conviction. He's got four felony convictions. She does not. This is a man who has a bad history being around children, being around family members. And so if that, that should, that should have come in what he did, because you have a, you have a presumably with the codefendants child and she's making threats and the police get involved in that. How has that, how has the evidence of what he allegedly did in the past or what he did in the past? He definitely had a sheath. How does that make it more or less likely that your client is not guilty of murder? Well, it shows that he has, well, the jury could believe that it was more likely him than her. The jury could believe, well, these are two women who are upset with one another. And it was Mr. Minkins who wanted to get involved again with my client. They had broken up. She moved on with her life. So that would have certainly helped the context and could certainly have changed the outcome. So at some point she moved on with her life and then later on, she and this is in the record that he wanted to have another relationship with my client. They'd broken up. All right. Let's let me move forward to the last point that you were making when you're talking about Miller. You brought up a couple of cases that had been decided, but I think the side door to Miller that you're seeking here was shut just last week with the case. No, I'm not your honor. I do apologize. Not a problem. It's very, very recent October 22. So it's 2020 ill 124046. And briefly, I'll just let you know that in that case, the defendant was charged with rape and murder of a woman. He was 16 years old when it happened. And he got a life sentence, the discretionary life sentence. And the Supreme Court held that Miller did not apply to that situation. So I'm not sure you're going anywhere with your Miller issue. But you can take a look at lesbian, you know, see what you think and respond in any way you want. Let's get back if I could for just a few moments and talk about the police station. They went to separate police cars, right? Yes, judge. Okay. The co defendant was handcuffed, right? Yes, judge. Your client was not handcuffed. That's correct. All right. And she was in a car that did not have a plastic partition, you know, a shield between the front seat in the backseat, right? Yes, judge. She was allowed to keep all of her personal belongings, including her cell phone, right? She was. And then in terms of the timing, it seems to me that you may have mixed up the timing a little bit. She was brought in to the police station, as we described at the same time as defendant on April 25. But it was April 26, when she was arrested for obstruction of justice the following day when she was brought back to the police station, correct? Yes, I'm saying it's day one and day two. And so if I said 24th and 25th, I apologize. No, no, you didn't. 26, 27. Your claim, your overarching claim here is that she was in custody on the 25th when she was brought in, right? Yes, and not Mirandized. Right. Even though she had all of her personal effects, they're still listening to what she's saying using it against her. And you back up that argument in part by saying that at some point in time, an attorney got involved. You claim at the bottom of page 22 of your brief, that defendant was not informed that Raymond Keenan had called when she was arrested for obstruction of justice on April 26. Yes, that's what he wrote. Yes. But he testified that he wasn't called until the I think that makes a material difference here because she gets arrested on the 26th and the evidence would appear to indicate that she was Mirandized and she offered finally to start talking. And on the following day, an attorney got involved. Her mother called the attorney. Her mother was out in the waiting room and my client did not want to be interrogated in terms of the polygraph. She said no to that and repeatedly said no to that. So it's a little, it's a little murky as to when exactly he was contacted by her mother and when he called in, but she wanted counsel. Well, it's not at all murky as to what he testified to. He testified that he was called on the 27th. Okay. You know, whatever her mother said, the lawyer who was involved, who got involved a little bit anyway, was called on the 27th, according to him. That's the evidence in the case that this jury heard, correct? Yes, Judge. That's all I have. Anything further? Nothing further at this time. Oh, you don't have any? I have no questions. You do? Okay, go ahead. No, I have no questions. Oh, all right. Then hurry. You may proceed. Thank you, your honors. Good morning. May it please the court. I am assistant state's attorney, Harina Megani-Wakely, representing the state of the people of the state of Illinois. Excuse me. The motion to suppress statements was properly denied here, where the totality of the it was made voluntarily. With respect to the violation of Miranda on the April 25th statement regarding when on the day that she was taken to the police station voluntarily based on her request to accompany the police officers, she was not in custody at that time implicating Miranda. None of the procedures were used that were present when the co-defendant was arrested. The co-defendant was handcuffed. He was advised of Miranda. He was searched. He was escorted in the car back to the station in the back. Here, the evidence showed that when the officer asked if she wanted a ride, she voluntarily went with them. And yes, she was driven in a police car, but that in and of itself does not suggest a custodial situation where she was not searched. She was placed in the back of the police car with no divider. She had her stuff. She was actually on the phone during the ride, and she was by there by herself without an escort. At the police station, once she got there, she was also not in a situation of a custodial such that Miranda was implicated. She was spoken to at the station in an open room with other officers walking around and other public personnel. The conversation during the next two, three hours, the nature of the conversation showed that it was not an interrogation. It was simply to establish a timeline for the co-defendant that the officers believed that her status as the girlfriend, she may be able to provide. She was simply treated as a witness as the trial court found and nothing to indicate that she was not free to leave. She did not ask to leave. And in fact, she left the station on her own rights, and she was allowed to leave. Likewise, after further investigation, the officers asked if she would come back to the police station to talk to them further. She agreed to go back to the station the following day on April 26. She went to the station at 9pm. There were no indicia of the station. She was allowed to go with her mother. And what the police officers asked her was, we have a discrepancy in something you told us, would you explain? And she was given that opportunity to explain. This was not an interrogation. It was we noticed some discrepancies. She was asked to take a polygraph, she declined. And as she declined, she also invoked her right to an attorney. And this right invocation was scrupulously honored by the police officers. Everything stopped. She was allowed to speak with her mother at her request. No further detectives spoke to her. And then of course, the detectives based on what they had gathered and based on her in so far as it related to the co defendant and did charge her with obstruction and she was placed under arrest. Now, with respect to the subsequent statements, that only began after defendant herself, knock knock, I would like to speak with you. She had invoked her right, the detectives had honored that right, and she opted to withdraw that invocation and speak to the detectives. And what did the detectives say? The first thing as they walked in to the the room, Miranda iced her, they gave her her Miranda, then the statement was recorded, as it should be because she was in custody. And she agreed during that time during the recorded statements that was subsequently viewed by the trial court and who had the opportunity to look at the totality of the circumstances as to whether her will was overboard. And what it showed was that she was treated as a witness until she admitted being in the car. She had a conversation with them. She was not browbeaten. There was no interrogation. It was a simple conversation. She was allowed to speak to her mother and had unfeathered access to her mother who was at the station. She was given Miranda several times. The statement was recorded. She agreed to take a polygraph. She was given a chance to rest overnight because she was obviously upset based on the observations by the officer. She specifically asked to talk to one of the officers where it was clear she had built a rapport with him and felt like she wanted to talk to him. She was given breaks throughout the entire incident. She was not interrogated constantly. She was given food, bathroom, a blanket when she expressed that she was cold. She was given opportunities to refute conflicting evidence. And the video clearly showed that she was cognizant at the age of 19, what the law considers an adult of what she was doing, what was going on, and that she knew how to assert her rights if she wanted to, but she chose not to. The trial court was absolutely correct in its characterization when it said that this was a course on how to conduct a fair interrogation. So based on that, the trial court's suppression ruling was absolutely correct and should be affirmed. With respect to the Siebert situation, this was not the giving of Miranda after a given a confession. That's what Siebert, the issue in Siebert was seeking to address. Here, defendant was given her rights. Her rights were honored prior to any admission that she gave. With respect to the attorney, Keenan, he called on April 27th after the defendant had been given her rights, after she chose to waive them, after she decided on her own accord to give a statement. And Keenan called at the time that defendant had agreed to take her polygraph. And the record, let's be clear, does not show that he was ever retained as an attorney. What the record shows is that he told the mother that for a small fee, I could go to the station and look into your daughter. But as he also admitted, mother never took him up on that offer. In fact, he later actually told the mother, you better hire an attorney, which also implied that he had not been retained as the attorney. Moreover, when the challenge is being made regarding the detectives and the officer's conduct towards Keenan, it's important to note what they did do. He made an inquiry at 1-11, according to his notes. And at that time, according to the credibility determinations and what the record showed, defendant was a witness. And so when the detectives told him that she was considered a witness, they were being truthful. Likewise, when Detective Rafferty called him back, he was out investigating. He wasn't waiting around for phone calls. He was investigating the case. And as soon as he got the message, he called him back and said, at this time, she is a murder suspect. Again, the truth at that time. The police never denied him access to the defendant. He knew where she was. He could have gone there, but he wanted money to do so. And he chose not to go there. So based on those reasons, there was nothing to indicate that the defendant's will was overborne when she made her statements, that they were given voluntarily. And for those reasons, the trial court suppression ruling should be affirmed. With respect to the evidentiary ruling that was properly made by the trial court regarding not allowing the prior bad acts of the co-defendant, there was no admissibility criteria met under the domestic violence statute, which was the plain wording of the statute says, the defendant's commission of another offense. This defendant was not seeking to admit her offenses, but a co-defendant's offenses. And the defendant's cases that she cites in our brief, as well as in the reply brief, Chapman, Howard, Grider, Smith, they all support the people's position that it all involved under this particular statute, defendant's own prior domestic violence acts, which were admitted. It was also not admissible under any traditional other crimes evidence of a co-defendant. Where in Lopez, this court has clearly said that for a prior bad act of a co-defendant, there must be a threshold showing that a crime took place and that the defendant who is seeking to admit the evidence either committed it with the co-defendant or participated. And there was no such evidence or suggestion made in this case. With respect to the Lynch analysis that could be applied to the prior bad acts, Lynch applies to when self-defense is raised and the victim's aggressive violent character is at issue. Here, she was not seeking to introduce a victim's aggressive character, and she was not claiming any self-defense from the victim. So under those statutes and under those traditional analysis under Lynch, other crimes evidence and domestic violence, the trial court was absolutely correct in rejecting admission of bad evidence. Moreover, when you look at the trial court's ruling, the trial court did the traditional balancing under evidentiary principles, weighed the probative versus prejudicial. This was an issue of relevance. Was this evidence relevant? And the issue was before the jury, was this defendant involved in the murder? And as the trial court noted, evidence that the co-defendant was a bad guy was not relevant to whether this defendant was also a bad person who had been involved in the murder. That was the issue before the court, the trial fact. And support for that is found in this case of People v. Ward, where a very similar analysis took place with respect to the prejudice and that it deprived her of mounting her defense. That is absolutely not true. She was able to argue throughout the trial that defendant, the co-defendant was the one who did it. The jury was fully aware that the co-defendant was charged with the murder. The ERI showed that co-defendant was a domestic violent person against the defendant. The ERI, the defendant talked about her state of mind, her context of predicament, her motivation, her lack of intent at the time of murder, all of the things that she was seeking to introduce this improper evidence of the co-defendant. And lastly, nothing prevented defendant from taking the stand if she wanted to and further give evidence to the jury. For these reasons, the trial court's evidentiary ruling was not an abuse of discretion. With respect to turning to the sentence and the constitutionality of the sentence, I was not aware, like my counsel, regarding the recent People v. Lusby. However, based on the indications regarding the fact that Miller, under the context that it's also being challenged here in this case, that it was rejected by the Supreme Court, the People would support the People's position that Miller is not implicated in this case. The Eighth Amendment challenge fails. She was not a juvenile. The as-applied proportionality fails because she was given a discretionary life sentence. The trial court had the opportunity to fashion an appropriate sentence. She was given a chance to argue her particular circumstances, and there was anything but a cold, calculated, and premeditated murder in which defendant actively participated in. And her active participation clearly distinguishes this case from the house defendant that is before this court as a comparison. For these reasons, and for all of the reasons stated in our brief, the People would respectfully ask that the defendant's conviction, as well as her sentence, be affirmed. Thank you. Any questions? Yeah, I have a question. Let's go back again to the timeline as I was questioning your colleague. The defendant in this case was brought in separately, but at the same time as the codefendant to the police station on the 25th, correct? Yes. And at that time, she had a conversation with the police officers about various matters, and it's your argument, and it was the argument in front of the trial court, that that was not a custodial interrogation. Is that the 26th, she confessed after being Mirandized and waived her Miranda rights. That's your position as well, right? Yes. The question I have for you is, when during the whole scheme of things here, and it's a relatively brief period of time, but when did the police learn of the history that the defendant had with threatening the victim? When did that information come to them? Your honors, I'm sorry. I'm not exactly clear. I do know that my focus, as I was, or the focus of the testimony was regarding what Miller told them, regarding them not being part of the alibi. You know, so when she came back to the station on the following day, after going to the station when the co-defendant was arrested, at that time, they had spoken to Miller regarding her statements to them from the night before that she was with Miller, the co-defendant, and they had gone to the nightclub, The Lick. And at that point, when talking to Miller, Miller said, hey, by the way, I'm not going to lie for the co-defendant. He had asked me to make up this story. And also, by the way, when the defendant called me when she left the station last night, and actually told me to stick to the story. That was the timeline. And then it was based on that, that they went to The Lick club and did their investigation throughout the day on the 26th. And I'm sorry, the conversation regarding the prior bad acts by the defendant was through Nyla, the best friend. And I'm not clear right now before you that as to when they spoke to Nyla, who had witnessed, you know, the aggressive behavior by the defendant. So I apologize. No problem. But it wasn't just that the threats were made. There were police reports filed by the victim against the defendant, correct? Um, yes, there was based on Facebook posts and everything there was. There was. Yes, but and the police could, you know, just look at this, even though she wasn't in custody, the police could look to see if she had any kind of a record if there are any complaints about her conduct, right? Um, they could have, but their focus based on the information that they had leading. I mean, what they had at the time that they were investigating this was that the victim had left with the co-defendant, that the victim had been seen with the co-defendant inside the Applebee's, that the victim based on the mother's testimony was still with the co-defendant when they, you know, when they left the Applebee's. And then, then the following morning, the mother attempted to try to find the victim and it was the co-defendant that told her, hey, I didn't see, I didn't see, you know, the victim last night, even though the mother based on her understanding, she was, her daughter was with the co-defendant. So the, based on that, the police's investigation was focused on the co-defendant because they had no indication at that point that the defendant was involved in any way. Um, all they knew was that this was a girlfriend, I mean, you know, a girl, the current girlfriend. And so their focus was in, and she probably spoke to defendant, let me see, you know, what, let's see what her timeline is. And then she gave them that timeline, which was, I was with the co-defendant during the time of the murder. And I was also with Miller. And it was based on that, that they started exploring, you know, investigating Miller. So at that point, they had no reason to believe that she was involved. And it was as the trial court found, it was very apparent that even Palmer, who was talking to the defendant throughout the entire statements, he was shocked when she said, I was actually in the car. I mean, up to that point, they, they thought she was just a girlfriend trying to protect her boyfriend who they had good evidence that he was the murderer. Again, I'm sorry if I didn't answer your question. I think you did okay. No problem. No more questions for me. I just have one. I just want to make sure I'm clear about the timeline on the second day, the 26th. So on the 26th, we have the police continuing to do their investigation. They're outside. Then also on the 26th, the defendant decides on her own to return to the police station with her mom? No, the police department called her during the day, and she was at school. And they spoke to her mother and, and indicated that they would like to talk to her, would she be willing to come down? And she agreed. And she came back at nine o'clock that evening with the mother and was spoken to by the police at that time. And at the time that they made that call inviting her to return, were they then aware that she was in fact a suspect suspect in the murder? They at that their suspicion that she was a suspect, a murder suspect? No, they they believe her still to be a witness. But again, based on her relationship, her girlfriend status, they were under the impression that she was just simply trying to cover for her boyfriend. And that, you know, that she was, hey, stick to the story that the co defendant co defendant told you, that's what she asked Miller to do. The co defendant had called Miller originally to set up his false alibi. And then when she when she left the station the night before, after the arrest of the co defendant, she called Miller. So So at that point, they had this conflicting from Miller, not I wasn't with them. And so she they wanted to ask her more questions, you know, hey, and that's what they did. They actually said to her, you know, you told us this, but Miller told us this. Can you explain Is there some discrepancy? And she proceeded to get take Miller out of the equation and say, you know what, you're right, Miller wasn't with us. I was with the co defendant. And we did this, this and this, I got my hair done. And so that's when they said, Well, you know, we still have the discrepancy, would you be willing to take a polygraph? And at that point, she invoked her right. She said no, invoked her right to attorney and all questioning stopped. All conversation stopped. What's going on in the 28 hours? In if she's, if she's there voluntarily, because they say, listen, something's not jiving, can you come back, help us clear it up, she comes back, and I'm not taking a polygraph, all of that. But then there's this 2028 hours about Ms. about which Ms. Watt talks, and there being this coercive environment for her to then confess. I'm not clear what's going on. And she comes back on the second day. And she's been questioned for 28 hours? No, she? No, absolutely not. Okay. After after she invoked her right to an attorney, when asked to take a polygraph, she was left alone in the room. And, and she asked to speak to her mother, and she was able to have a private conversation with her mother. And during that time, based on now her decision not to take a polygraph, the and and the conflicting evidence, the detectives did make a determination at that point, that they would charge her with obstruction, not for and for misleading their investigation, because they had, she had already said, you know, they were with Miller, they investigated Miller said no, and they gave her an opportunity to explain. And so they so they charged her with obstruction. And at that point, she was in custody. Now, because she had invoked her right to counsel, they did not go in there at that point and advisor of Miranda, because again, they were honoring her invocation of a right to attorney. When she decided that she after talking to her mother, she decided that she did want to talk to the police officers. And she went ahead and got their attention. And at that point, the officers walked into the room. And the first thing that they did was because they had determined that they were taking her into custody, or that she was now in custody on the obstruction charges, they did give her their her Miranda. And and so she was Miranda iced. And then she agreed to take the polygraph, the polygraph, unfortunately, had to be done the next day, because she was upset. And the polygrapher who had been contacted did indicate that the subject has to be calm when when it has to, you know, when the test has to be done. And so she was in the station overnight, but she wasn't spoken to while waiting for the polygraph, which she agreed to take. And the next morning, at 10 o'clock, the polygrapher comes to the station, but and during the interim, she's given food, she's given blanket, she's allowed to use the bathroom, she's not being spoken to. And when the polygrapher came, the polygrapher also made sure she understood her rights. Miranda iced her, she agreed to take the polygraph. And that took approximately four hours. And at two o'clock, the she specifically asked, after the polygraph, results were indicated to her that they were deceptive. She specifically asked to talk to one of the detectives, Detective Palmer, who she had had this rapport with. And she said, Can I speak to the detective Palmer, you know, the guy with the mustache, he went in, and they talked about the polygraph results. And as and so the detective said, things aren't jiving, what you're telling me is not not correct. The polygraph shows that, you know, you were more involved, etc. And she says, you know what, I was in the car when I'm going to just interrupt you for one minute, because I'm really focused on this 28 hours. So from nine o'clock, in the evening on the 26th, until 10 o'clock, on the morning of the 27th, where there is conceivably at some period in this, at some point in this period of time, they know that they want or she's, she's charged with obstructing justice. She's still at the hours for obstructing justice, waiting for a polygrapher. And that's not coercive. Your Honor, it's, it was based on, I mean, she got to the station at nine o'clock, after talking to them, it was it was approximately midnight. And when they did contact, contact the polygrapher, she was upset. And so the determination, I mean, the polygraph, even if the polygrapher had come right at that moment, she he specifically testified that when a subject is that upset, the polygraph results are not reliable, they can't be given, and he won't give them, I believe this testimony. I get all that we need a calm, collected person for the polygraph. My issue is nine o'clock at night. Polygraph is not there until the next morning. What we have at some point in time is a charge of obstruction of justice. Why isn't it then go home, we'll get the polygraph because at that point, according to what you're telling us, they're still investigating, they don't know that she's a murder suspect. She is suspected of obstructing justice until about two o'clock the next day. And she is in custody. And she was in custody for obstruction, she was not going to go home. And the detectives were very clear that when that determination was made, she was no longer free to leave. And and so while she was beat, so it was kind of she was being held on the polygraph that took place the next morning. I mean, of course, there's a rational explanation why the polygraph on the murder portion of it was the next morning because of her upset state. But she even if she had not agreed to take the polygraph, she was not walking home. She was not was told who was the mother who was at the police station. The mother was told what she was being charged with. And so I and so with respect to, you know, during that time, if one is going to look at did all of that lead up to the voluntariness of when she finally gave her statement regarding the murder. I mean, she was not it was she was not interrogated during that time. She was not deprived of a bathroom, she was given food, she was allowed to rest, she was given a blanket when she expressed being cold. I mean, all of the things and she never, she was never deprived of anything. She didn't invoke any of her rights during that time. And we all know that she clearly knew what her rights was, because she invoked her right to an attorney originally. And she never did any of that. And her mother was there. And there was no evidence that the mother was deprived access to her daughter. But no, I mean, to be clear, she was in custody, and she wasn't going anywhere on the obstruction charge. And nothing else. All right, Marcia, you may proceed. Thank you, Your Honors. It's it's not logical that the police would not have been looking at Miss Thomas as a possible suspect from much sooner back when they were surveilling Mr. Minkins, and they saw that she was with him. Of course, they're going to say to themselves, well, who's this? And what is her part in all this? It's not plausible that she was not considered a suspect much earlier than the state is saying they would have had to they would have had information between the two interviews in the overnight 25th to 26. They would have had information that from that Mr. Miller had something different to say about an alibi. So when she walked into the station day two, she walked in a suspect. And also, excuse me, Your Honor. I apologize. The obstruction charge took place day two. So that charges in place that keeps her in custody. It gives the police time to wear her down. She did not want to give she did not want to give was said initially. And in terms of the evidentiary issue, relevance, relevance, relevance. There's nothing and there's nothing in the statute barring the admission of that evidence. And so that should have been admitted in fairness and a due process so that my client could better prove that someone else committed the crime. In terms of one of you said that she could have testified, she didn't have to testify. She was not obligated to testify on her own behalf. In the spirit of Miller and Buffer, with the 40 year cap, 40 years being unconstitutional. And we have here, again, house where it said 18 is an arbitrary age. The natural life sentence is not in the spirit of Buffer. And I'm asking in the interest of due process for a new trial, at the very least a new sentencing hearing. Anything? I have one question for you about when you were talking about the prior acts of violence by codefendant not coming in. I think when you first argued, you mentioned that that was relevant because it could be taken by the jury as evidence that he was grooming the codefendant for some evil purpose, correct? Well, that that could be, I mean, there was actually said, but I was what I was arguing was that that evidence would go to him being the sole perpetrator. And it depends on the right to say somebody else did it. How could that evidence go to establish that he's the sole perpetrator when you've got DNA of your client introduced in evidence in this case, where are you going with that one? The jury can believe what the jury wants to believe. If they want to acquit and all the, and the person, my client has had the chance to get all the evidence in for a good defense, they could believe that. Thank you. Any further questions? Nothing. Nope. All right. Thank you both very much. You both really argued your case. Well, this is one of the better ones we've had. I enjoyed both you and I thank you for your time and we'll let you know the results as soon as we get our heads together. Yeah, I totally agree. Great advocacy on both sides.